Mr. Chief Justice Alvey
delivered the opinion of the Court:
This action was brought on the 13th day of December, *89 1893, and with the declaration was filed an account or hill of particulars, for work and service performed by the plaintiff for the defendant. The declaration alleges that the plaintiff is a corporation, incorporated by the law of the State of West Virginia, doing business in the District of Columbia; and that the defendant is indebted to it in the sum of $126.31, for messenger service rendered by the plaintiff to the defendant; for constructing a temporary burglar alarm by the plaintiff for the defendant; for rental of a burglar alarm from the.plaintiff by the defendant; for rewiring house by the plaintiff for the defendant; and for cutting grass by the plaintiff for the defendant; all at his special instance and request. And in like sum, for work and labor, care and diligence of the plaintiff, done, performed, and bestowed in and about the business of the defendant at his request; with the common indebitatus assumpsit counts added.
The declaration does not profess to be founded upon any special, subsisting contract, and therefore does not allege performance of such contract by the plaintiff as a condition to the right of action. It simply proceeds as upon a quantum meruit for work, labor and services performed for the defendant.
It appears that the first summons for the defendant was returned “not summoned, or not found,” and that an alias summons was issued, and which was served on the defendant on the 27th day of December, 1897. It was to this summons that the defendant appeared.
The defendant interposed three pleas. 1st. That the action did not accrue within three years before suit brought. 2d. That the defendant was not indebted as alleged; and 3d. That the alleged indebtedness of defendant to plaintiff is by virtue of a contract made by defendant with the plaintiff on the 28th day of June, 1892, but that the plaintiff failed to perform said contract, to the great damage of the ‘ efendant.
*90 As will be observed, the terms of the contract are not set forth, nor is it made apparent by the plea whether the alleged breach of the contract is set up by way of set-off, or by way of recoupment or deduction. The plaintiff, however, joined issue upon all three of the pleas; and under the issue thus formed upon the third plea, or even under the general issue plea of not indebted as alleged, it was competent to the defendant to show by proof that the work and labor and services declared for by the plaintiff were done and supplied under a special contract, and that such work and services were so negligently and unskillfully done and performed as to be of little or no value to the defendant, or that the contract had been violated by the plaintiff to the injury of the defendant, and therefore the latter was entitled to a deduction of the damages thus occasioned by the breach by the plaintiff. This is now the settled principle both in the English and American courts. Basten v. Butler, 7 East, 478, 483; Runyan v. Nichols, 11 John. 547 ; Sill v. Rood, 15 John. 230; Grant v. Button, 14 John. 377; Withers v. Green, 9 How. 213, 228, 229, 230.
On the trial, the plaintiff gave evidence, by its manager, R. G. Oallum, tending to prove that it had made a contract with the defendant to place a burglar alarm in his house, No. 1634 I street northwest, in the city of Washington, and connect the same with its office, and to place wires through the said house attached to all doors and windows therein; and gave evidence by said witness to prove the correctness of the charges contained in the account or bill of particulars attached to the declaration, and the reasonableness of the prices charged for the work and services therein specified; and gave proof tending to show that the plaintiff had fully complied, on its part, with the contract made with the defendant.
And, on cross-examination, the witness proved the making of a special contract by and between the plaintiff and defendant, and which was signed by the witness as general *91 manager of the plaintiff, and which contract is as follows:
“The Mutual District Messenger Co., of Washington, D. C., has this 28th day of June, 1892, received of Mr. A. C. Tyler, residence No. 1634 I St., Washington, D. C., together with its contents, which, for the consideration named in application, (a copy of which is attached) the said messenger company agrees as follows:
“First. To protect the property against burglary until returned to possession of A. C. Tyler, which shall be whenever the latter calls upon us to do so; provided all rentals and other proper charges have been paid.
“Second. Not to allow any person or persons to enter said property (except employees in the line of their duty), without the written consent of A. C. Tyler.
“Third. To visit the premises not less than once each week, and to take the necessary steps to keep them in good order.
“Fourth. To notify A. C. Tyler provided address is known, of any accidents that may happen to the property, that the same may receive prompt attention.
“Fifth. That the messenger company will not be liable for damage done by action of the elements, defective plumbing, nor occurring from any cause whatever, except through direct negligence of the messenger company’s employees.
“Sixth. That in case repairs of any nature become necessary for the safe keeping of the property, and the whereabouts of A. C. Tyler are not known, the messenger company will have such repairs made at as reasonable cost as practicable, which expense will be accepted and borne by A. C. Tyler.
“Seventh. That the material used by the messenger company in construction of the burglar alarm shall remain the property of the messenger company, and will be removed when the premises protected are turned over to the possession of A. C. Tyler.
“It is understood that any work done about the premises *92 through the messenger company, such as cutting and watering grass, cleaning snow from pavement, cleaning yard, dusting house, etc.; will be paid for by A. C. Tyler, but such charge is to be reasonable.
“R. G. Callum, Manager
On the. back of this contract there is a printed form of application, which states the price to be paid upon completion of certain parts of the work mentioned in the contract, but which application does not appear to have been signed by Tyler.
The witness, Callum, also proved the receipt and genuineness of the following letter or order from the defendant to the plaintiff in regard to the furniture in the house, which was read in evidence:
“Electric Burglar Co., Washington, D. C.
“Mr. Wurdeman, 610 12th st., has charge of the furniture, etc., in my house, 1634 I st. Please allow him admission whenever he may desire it.
“Yours, etc., A. C. Tyler.
“9-30, July 29, 1892.”
The plaintiff also offered to read in evidence the following letter or order from Mrs. Tyler, the wife of the defendant, to the plaintiff, in regard to curtains and furniture in the house, to wit:
“The Burglar Alarm Co. :
“The Burglar Alarm Co. will allow Wurdeman & Co. to take curtains and furniture from 1634 I st., and to do work there as ordered b.y me. The Burglar Alarm Co. will please open and close the house when necessary for this work, and. oblige, Mrs. A. C. Tyler.
“ Washington, D. C., Nov. 22, 1892.”
To the reading of this order purporting to be written by the wife, the defendant objected, first, because the same was not sufficiently proved to be the genuine letter of the wife, and second, because of the supposed want of authority, on *93 the part of the wife, to write such letter or order to bind or affect the rights of the husband under the contract.
The witness Callum testified in regard to the letters or orders offered in evidence, that he knew the signatures of both Mr. and Mrs. Tyler, by means of correspondence, and having seen their signatures upon telegrams, and upon the tickets of the company, returned to the office by messenger boys, but he admitted that he had never seen either Mr. Tyler or Mrs. Tyler write. And upon this evidence the court ruled the letter or order of Mrs. Tyler to be sufficiently proved to be admitted in evidence to the jury, and we think that ruling was correct.
In Sec. 577 of Vol. 1 of Greenleafis Evidence, it is said that there are two modes of acquiring knowledge of the handwriting of another, either of which is universally admitted to be sufficient to enable a witness to testify to the genuineness of the handwriting. The first is from having seen the party write, though but once, and then only his name. The second mode is, from having seen letters, bills, or other documents, purporting to be the handwriting of the party, and having afterwards personally communicated with him respecting them; or acted upon them as his, the party having known and acquiesced in such acts, founded upon their supposed genuineness; or, by such adoption of them into the ordinary business transactions of life, as induce a reasonable presumption of their being his own writings. The author cites, in support of these propositions, many decided cases, both English and American. See Doe v. Suckermore, 5 Ad. & El. 731; Thorpe v. Gisburne, 2 C. & P. 21; Johnson v. Daverne, 19 John. 134; Redding v. Redding's Estate, 69 Vt. 502.
Then, with respect to the second ground of objection to the admissibility of the letter or order, that of the want of authority in the wife to bind the husband, we think the court was entirely right in overruling that objection. It is true, the wife can not bind the husband by her contracts, except as his agent, but this agency may be inferred by a *94 jury in the cases of orders given by her in those departments of her husband’s household which she has under her care and control. 2 Kent. Com. 179. It is said by the authorities that every married woman residing with her husband, and having the general management of his house and household affairs, is presumed to be his general agent in all matters connected with the domestic economy of the house and family. She is, therefore, clothed with an implied authority from the husband to give orders for wearing apparel, furniture, provisions, and 'all such things as may fairly be presumed necessary for the decent maintenance of herself, her husband and family, and the general comfort and enjoyment of the household, according to the apparent circumstances and situation in life of her husband, and the position in society which he allows her to assume. 1 Add. on Contr. 137; Schoul. Dora. Rel., Secs. 63, 64, p. 96. The authority thus implied, which is ordinarily vested in a wife, would seem to be ample for the order of Mrs. Tyler of the 22d of November, 1892. It had relation to subjects-matter that were immediately under her supervision and control as part of the household economy. As was said by Lord Abinger, C. R, in the case of Emmett v. Norton, 8 C. & P. 506: “Where a wife, in the ordinary management of her husband’s household, gives an order to tradesmen for the benefit of her husband and family, and such order is proper, it is presumed that she has the authority of the husband for so doing. This rule is founded on common sense, for a wife would be of little use to her husband in their domestic arrangements, if she could not order such things as are proper for the use of a house and for her own use, without the interference of her husband. The law therefore presumes that she does this by her husband’s authority.”
There was no error, therefore, in admitting the letter or order of Mrs. Tyler to the plaintiff, to be read in evidence to the jury.
At the close of the evidence on the part of the plaintiff, *95 the defendant moved that the case be taken from the jury, because, as contended, there was no‘Sufficient evidence given to show that the plaintiff was a corporation under the laws of West Virginia, as alleged in the declaration, but which motion was refused by the court; and that ruling, as we think, was a very proper one.
One of the pleas of the defendant, as we have seen, was a general issue plea of not indebted as alleged. This plea, going to the merits of the case, admitted the corporate existence of the plaintiff and its right to maintain the action, though it be alleged in the declaration that it is a foreign corporation. Union Cement Co. v. Noble, 15 Fed. Pep. 502 ; The Society for Propagation, etc., v. The Town of Pawlet, 4 Pet. 480, 501. In the last mentioned case, the Supreme Court of the United States, in speaking of the effect of pleading to the merits of the case when the plaintiff was a foreign corporation, said: “The general issue is pleaded, which admits the competency of the plaintiffs to sue in the corporate capacity in which they have sued. If the defendants meant to have insisted upon the want of a corporate capacity in the plaintiffs to sue, it should have been insisted upon by a special plea in abatement or bar. Pleading to the merits has been held by this court to be an admission of the capacity of the plaintiff to sue. Conard v. Atlantic Ins. Co., 1 Pet. 386, 450.” A plea in bar admits the ability of the plaintiff to sue, and if the parties go to trial on that issue, the presumption is, that the ability to maintain the action continues. Yeaton v. Lynn, 5 Pet. 224. The existence of the plaintiff coi’poration was not only admitted by the defendant’s plea of not indebted as alleged, but under the issue made on that plea no question of the capacity of the plaintiff to sue could be raised. Railway Co. v. Quigley, 21 How. 202.
Upon the court refusing to take the case from the jury, the defendant proceeded to produce evidence tending to prove that while his house was in charge and care of the *96 plaintiff, under the contract of June 28, 1892, the house was entered and a closet therein broken open, and curtains and draperies that were packed in said closet were taken therefrom and carried away by some person unknown, to the value of $104. This amount the defendant claims should be deducted from the claim of the plaintiff.
At the conclusion of the evidence, the defendant requested the court to instruct the jury, that if they found from the evidence “ that a theft occurred on the property of the defendant while the same was in the charge and under the protection of the plaintiff, the burden of proof was upon the plaintiff to show that it was not committed by or due to the negligence of the plaintiff’s employees, and that if the plaintiff does not so prove, their verdict must be for the defendant.” This request was refused by the court, and, in view of the proof in the case, we do not see how the court could have ruled otherwise than it did. It was shown in the proof that a week before the curtains were missed, the house had. been taken possession of by the housekeeper of the defendant, and that she had employed several persons to work in the house, and to clean it up. She says, in her testimony, that “she could not remember how many pairs of curtains she put in the closet, nor how many pairs of curtains she sent to be cleaned, and that she did not count the curtains when they were taken out of the closet and turned over to Mr. Burch,” — a party, or employee acting for Wurdeman & Co.; and “that she did not discover that any curtains were missing until a week after she took possession.” She further says, “that after receiving the house from the plaintiff she employed several men and women to clean and arrange the house for the reception of Mrs. Tyler; and that these employees were employed for about a week in the house, and that they worked all over the house, and that witness did not stay with them all the time that they were working in the house.”
Mr. Burch, the person to whom curtains were delivered by the housekeeper to be hung, proved that he hung *97 all the curtains that were furnished him by Mrs. Barton, the housekeeper. And Mr. Wurdeman testified that he could not remember whether curtains bad been taken from the house of the defendant or not. He says, however, “ that he may have taken something out of the house, and may have taken curtains, but that it had been so long ago he could not say positively; that he did not recollect whether he had the key of the closet or not, but that he may have opened the closet, and that he may have had access to the closet where the curtains were stored.”
This testimony, taken in connection with the orders or letters of the defendant and his wife, in regard to the right of Wurdeman & Go. to enter the house and take charge of the furniture and curtains therein, completely relieved the plaintiff of the onus of proving by affirmative evidence, under the contract, that the curtains were not stolen or taken from the house by the negligence of its agents or employees. By the terms of these letters or orders to the plaintiff, the latter was relieved of the ordinary responsibility of a bailee to whom goods had been delivered to be kept for hire, so far as the furniture and curtains were concerned. Under the special contract produced in evidence, the very essence of which was due care on the part of the plaintiff, if no other evidence had been produced to modify its terms and application, the plaintiff would certainly have been required to account for tbe missing curtains, if they were in fact taken from the house while in charge of the plaintiff, or it would have been incumbent upon it to show by affirmative proof that the loss of the missing articles had not been occasioned by any negligence of its agents or employees. But, if after the house and its contents had been turned over to the control of the housekeeper of the defendant, the articles were taken from the house, then clearly, in no aspect of the case, would liability attach to the plaintiff as bailee of the articles alleged to be missing.
*98 It is a settled principle, both by the civil and the common law, that all persons to whom goods and chattels are delivered to be kept for hire and reward, and who are paid expressly and specifically for the exercise of their labor and care in keeping them, and not merely for the finding of a place of deposit, are bound to exercise that degree of care and vigilance for their preservation, which the most prudent and careful of men exercise for the protection of their own property. Poth. Pand. Lib. 12, Tit. 2, Art. 3,72; Sto. Bailm, Sec. 454; Cairns v. Robins, 8 M. & W. 258. And under such contract as we have in this case, stipulating for the exercise of care and diligence, if that contract stood alone and irrespective of the subsequent action of the bailor or owner of the goods, the mere fact of the loss of the goods would be prima facie proof of negligence, and the bailee would be required to rebut that presumption by showing that he had taken the greatest care of the things intrusted to him, and that, by the exercise of such diligence, he could not prevent the loss. Add.- on Torts, 412, 413.
But in this case, if the jury found, as they well might, that the curtains in the house of the defendant were taken charge of by Wurdeman & Co., or by their employees, or taken from the house by them, under the orders from the defendant and his wife to the plaintiff, or were taken or stolen from the house after the possession of it had been surrendered to the housekeeper of the defendant; clearly, in such case, no liability would attach to the plaintiff as bailee, under the contract of June 28, 1892. The prayer of the defendant, however, disregarded all the evidence that tended to relieve the plaintiff of responsibility for the lost curtains, and sought to fix liability and the burden of proof upon the plaintiff, solely upon the terms of the contract for safe keeping, without reference to the other evidence in the case. In rejecting that prayer the court below was clearly right.
The next and last question presented, is one that relates *99 to the supposed application of the statute of limitation, as a bar to the right to maintain the action. The defendant prayed the court to instruct the jury, that if they found from the evidence that the plantiff had not used due diligence in having a summons served upon the defendant the statute .of limitation applied, and they must find for the defendant.
The action was duly and regularly commenced within the period of limitation prescribed by the statute, and according to the mode prescribed by rule 6 of the Supreme Court of the District. Whether there had occurred a discontinuance of process or of the action was a question of law, dependent upon a certain state of facts that might be found to exist. The necessary facts to be shown, if controverted, might be submitted to the finding of the jury; but the question as to the legal effect of the facts when found to exist, is one of law for the court to decide, and not the jury. Otherwise the question in every case whether there had been a discontinuance or not would be decided according to the varying and uncertain notions of juries, without the control of the court. This would be contrary to principle, and to all precedent. The prayer offered by the defendant proposed to submit to the jury both the question of law and of fact, as a general question of negligence in failing to have a summons served upon the defendant within time. As we have said, the question whether the action was discontinued or not before process served upon the defendant, was a question of law for the court; and unless the action and process thereon had been discontinued, within the meaning of the law, the statute of limitation did not apply, as the action had been regularly commenced within the statutory period for instituting the same. Parsons v. Hill, 15 App. D. C. 532; and see, also, the case of Hysinger v. Baltzell, 3 G. & J. 158, 162.
There was, howevér, evidence given of the exercise of diligence on the part of the plaintiff to ascertain when *100 process could be served upon the defendant, and that process was served at the earliest time reasonably practicable. This was all that could, in reason, be required under the statute. Hysinger v. Baltzell, supra.
Finding no error in the rulings of the court, the judgment appealed from must be affirmed ; and it is so ordered.

Judgment affirmed.